<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STATE OF MINNESOTA, *by its Attorney General Keith Ellison*, <br><br> Plaintiff, <br><br> v. <br><br> SANOFI-AVENTIS U.S. LLC, et al., <br><br> Defendants. | Case No. 3:18-cv-14999 (BRM) (LHG) <br><br> **OPINION TEMPORARILY** <br> **FILED UNDER SEAL** |

**MARTINOTTI, DISTRICT JUDGE**

  Before the Court is a Joint Partial Motion to Dismiss filed by Defendants Sanofi-Aventis U.S. LLC ("Sanofi"), Novo Nordisk, Inc. ("Novo Nordisk"), and Eli Lilly and Company ("Eli Lilly") (collectively, "Defendants"), seeking to dismiss the Second Amended Complaint of the State of Minnesota ("Plaintiff"). (ECF No. 93.) Plaintiff filed an Opposition to Defendants' Motion to Dismiss (ECF No. 102) and Defendants filed a Reply (ECF No. 108). Having reviewed the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Defendants' Joint Partial Motion to Dismiss is **GRANTED WITH PREJUDICE**.

**I. BACKGROUND**

  **A. Factual Background**

  For the purposes of this Motion to Dismiss, the Court accepts the factual allegations in the Second Amended Complaint as true and draws all inferences in the light most favorable to the

Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Because the factual background has been explained in depth in this Court's prior Opinion, *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, Civ. A. No. 318-14999, 2020 WL 2394155 (D.N.J. Mar. 31, 2020), the Court will only provide a brief summary of the facts underlying this action.

Defendants are three of the largest insulin manufactures in the world. (ECF No. 75 ¶ 2.) Plaintiff alleges Defendants publish misleading inflated benchmark prices for their insulin products, "which allow them to offer higher rebates to [Pharmacy Beneficiary Managers ("PBMs")] while still earning approximately the same, secret net price that they previously received." (*Id.* ¶ 3.) The residents of Minnesota and the Department of Corrections have paid inflated prices for life-saving insulin because of Defendants' practices. (*Id.* ¶ 4.)

Specifically, Plaintiff alleges Defendants' pricing scheme operates in the following way. First, manufacturers, including Defendants, determine the price it will sell a given drug to a wholesale drug distributor—the "Wholesale Acquisition Cost" ("WAC"). (*Id.* ¶ 31.) However, the actual price Defendants receive for the drugs they sell to wholesalers is less than the WAC, because the WAC does not account for discounts manufacturers offer to pharmacy benefit managers ("PBMs"). (*Id.*) Wholesale drug distributors establish a given drug's Average Wholesale Price ("AWP"), but this price is just a mathematical function of the WAC, since it "is either directly set by the manufacturer, or is established by adding a certain mark-up to the manufacturer's WAC price, usually around 20%." (*Id.* ¶ 32.) As such, Plaintiff alleges Defendants effectively set both prices. (*Id.*) WAC and AMP are referred to as "list" or "benchmark" prices. (*Id.*) Importantly, the AWP is used to determine the price at which health plans and PBMs "reimburse pharmacies for prescriptions they fill for plan members." (*Id.* ¶ 33.) Plaintiff alleges Defendants "disseminate and publish the benchmark prices they set for their products, including insulin, with a variety of

reporting services, such as the Red Book, Gold Standard Drug Database, and Medi-Span Price Rx, for further public dissemination." (*Id.* ¶ 34.) These services do not, and cannot, "independently verify prices that manufacturers receive after paying PBM rebates, because rebate contracts are confidential." (*Id.*) However, Plaintiff alleges Defendants know "many other entities rely on the publications containing the benchmark prices they have disseminated to reporting services to set their own prices." (*Id.*) And many PBMs expressly rely on the published benchmark prices to determine the reimbursement rates paid to pharmacies. (*Id.*) Further, some Minnesota pharmacies directly rely on Defendants' benchmark prices for insulin to set the retail prices they charge uninsured and under-insured Minnesotans for the life-saving medication. (*Id.* ¶ 35.) According to Plaintiff, this results in Minnesotans paying more for "life-sustaining medication based on the deceptive and inflated AWPs of Defendants' insulin products that they disseminate, publicize and publish." (*Id.*) The prices paid by certain Minnesota patients increases if Defendants raise their benchmark prices regardless of whether wholesalers or pharmacies add any markups to the WAC, since "Defendants' benchmark prices are the lodestar for the price charged during all subsequent sales of insulin." (*Id.* ¶ 37.)[1]

  **B.**  **Procedural Background**

On October 16, 2018, Plaintiff filed the Complaint against Defendants. (ECF No. 1.) On March 15, 2019, Plaintiff sought leave to file a first amended complaint (ECF No. 19), which was granted on April 2, 2019 (ECF No. 20.) On April 11, 2019, Plaintiff filed a First Amended Complaint, alleging sixteen counts against Defendants. (ECF No. 22.) Counts One through Four,

---

[1] A more complete description of the factual background, which includes the specifics of Defendants' drug reimbursement, pricing scheme, and its effect on consumers, is available in this Court's prior Opinion. (*See* ECF No. 74 at 4–11.) To the extent Plaintiff provides additional facts in its Second Amended Complaint, the Court provides them below in Part III.

for violations of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, were against Novo Nordisk (ECF No. ¶¶ 88–195); Counts Five though Eight for violations of RICO, were against Sanofi (*Id.* ¶¶ 196–303); Counts Nine through Twelve for violations of RICO, were against Eli Lilly (*Id.* ¶¶ 304–411) (collectively, Counts One though Twelve were the "RICO Claims"); Count Thirteen for consumer fraud, Minn. Stat. Ann. § 325F.69, was against all Defendants (*Id.* ¶¶ 412–17); Count Fourteen for deceptive trade practices, Minn. Stat. Ann. § 325D.44, was against all Defendants (*Id.* ¶¶ 418–22); Count Fifteen for false advertising, Minn. Stat. Ann. § 325F.67, was against all Defendants (*Id.* ¶¶ 423–27); and Count Sixteen for common law unjust enrichment, was against all Defendants (*Id.* ¶¶ 428–35). On August 12, 2019, Defendants moved to dismiss (ECF No. 47) and on September 26, 2019, Plaintiff opposed (ECF No. 54). On November 11, 2019, Defendants replied (ECF No. 57) and on December 26, 2019, Plaintiff filed a sur-reply (ECF No. 63.)

On March 31, 2020, this Court granted Defendants' Motion to Dismiss the RICO claims without prejudice, denied Defendants' Motion to Dismiss Count Thirteen (Consumer Fraud), granted in part and denied in part Defendants' Motion to Dismiss Count Fourteen (Deceptive Trade Practices), granted Defendants' Motion to Dismiss Count Fifteen (False Advertising) without prejudice, and denied Defendants' Motion to Dismiss Count Sixteen (Unjust Enrichment), the Department of Corrections Claims, and the New Insulin claims. (*See* ECF No. 74 at 44–45.)

On April 21, 2020, Plaintiff filed a Second Amended Complaint against Defendants. (ECF No. 75.) Plaintiff's Second Amended Complaint re-alleges its RICO claims against Novo Nordisk and Eli Lilly. Specifically, Plaintiff brings Counts I, II, III and IV against Novo Nordisk for RICO violations (ECF No. 75 ¶¶ 94–201), Counts V, VI, VII, and VIII (*id.* ¶¶ 202–309) against Sanofi for RICO violations, and Counts IX, X, XI, and XII (*id.* ¶¶ 310–417) against Eli Lilly for

4

RICO violations (collectively "the RICO claims"). Each of the alleged RICO violations seek injunctive relief. Additionally, Plaintiff brings Count XIII (*id.* ¶¶ 418–423) for Consumer Fraud, Count XIV (*id.* ¶¶ 424–433) for Deceptive Trade Practices, Count XV (*id.* ¶¶ 434–441) for False Advertising and Count XVI for Unjust Enrichment (*id.* ¶¶ 442–449) against all three Defendants.

On July 17, 2020, Defendants filed a Joint Partial Motion to Dismiss Plaintiff's Second Amended Complaint. (ECF No. 93.) The Motion to Dismiss seeks to dismiss Plaintiff's RICO claims against Defendants (Counts I–XII) and Plaintiff's False Advertising Claim under Minnesota law (Count XV). (*See* ECF No. 93-1.) Plaintiff filed an opposition on August 25, 2020 (ECF No. 102) and Defendants replied on September 28, 2020 (ECF No. 108).

## II.   LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec.*

*Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220).

### III. DECISION

Defendants make three main arguments. First, they note Plaintiff's RICO claims have already been dismissed by this Court and argue that the law of the case doctrine prevents Plaintiff from re-litigating the issue of whether RICO confers a private right of action for injunctive relief. (ECF No. 93-1 at 5.) Second, Defendants argue even if Plaintiff is not procedurally barred from re-pleading claims this Court has already rejected, the private right Plaintiff is claiming under RICO is unavailable. (*Id.* at 7.) Third, Defendants contend Plaintiff's false advertising claim should be dismissed because Plaintiff's allegations fail to state a claim under the Minnesota False Statement in Advertising Act ("MFSAA"). (*Id.* at 8–9.)

Plaintiff argues its RICO claims should not be dismissed because "the Third Circuit has indicated that the powers available to the Court under RICO extend beyond those specifically enumerated for private and federal government parties." (ECF No. 102 at 5.) As a result, Plaintiff asks the Court to permit it to pursue injunctive relief under RICO. (*Id.* at 9.) Additionally, Plaintiff argues it has properly re-pled its allegations under the MFSAA. (*Id.* at 9–15.) The Court will address each set of arguments in turn.

#### A. Law of the Case and RICO

Defendants argue for application of the law of the case doctrine since this Court has already resolved the issue of whether injunctive relief is available to Plaintiff under the RICO statute. (ECF No. 93-1 at 4–5.) Plaintiff requests the Court allow it to pursue injunctive relief under RICO, noting

7

the cases it cites in its brief "indicate that courts in the Third Circuit have allowed such claims to survive a motion to dismiss." (ECF No. 102 at 9.)

"[T]he [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983); *Daramy v. Attorney Gen. of U.S.*, 365 F. App'x 351, 354 (3d Cir. 2010). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting another source). "The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it." *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994); *United States ex rel. Silver v. Omnicare, Inc.*, Civ. A. No. 11-1326, 2020 WL 7022664, at *3 (D.N.J. Nov. 30, 2020) ("The doctrine of the law of the case precludes review of legal issues previously decided.").

Under this doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances. The doctrine's purpose is to promote the "judicial system's interest in finality and in efficient administration." *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154, 156 (3d Cir. 1980); *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1981). Courts have "the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loath to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (quoting *Arizona*, 460 U.S. at 618 n.8). "In other words, the law of the case doctrine does not limit a federal court's power, rather it directs its exercise of discretion." *Lambert v. Blackwell*, 387 F.3d 210, 236 n.20 (3d Cir. 2004) (citing *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)).

Plaintiff notes the Second Circuit's decision in *Chevron Corp. v. Donzinger*, 833 F.3d 74 (2d Cir. 2016) and the Seventh Circuit's decision in *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001) indicate "the powers available to the Court under RICO extend beyond those specifically enumerated for private and federal government parties." (ECF No. 102 at 5–6.) Further, Plaintiff emphasizes "the Third Circuit has held that the remedies in 18 U.S.C. § 1964(a) are available to parties whose rights of action are enumerated later in RICO," relying on *U.S. v. Local 560*, 780 F.2d 267, 295 (3d Cir. 1985). (*Id.* at 6–7.)

In short, the Second Circuit in *Donzinger* found, as a matter of first impression, RICO authorizes granting of equitable relief to a private plaintiff. 833 F.3d 74, 137. After noting other circuit courts to "expressed divergent views" on the issue, the Second Circuit read § 1964(a) as giving "federal courts jurisdiction to hear RICO claims" and setting "out general remedies, including injunctive relief." *Id.* at 138. And it read § 1964(c) as providing "a private right of action for any person injured in his business or property by reasons of a violation of § 1962." *Id.* Largely relying on the reasoning of the Seventh Circuit in *Scheidler*, the Second Circuit held § 1964(a) allows for "injunctive relief, that all plaintiffs authorized to bring suit may seek" and § 1964(c) "similarly adds to the scope of § 1964(a), but this time for private plaintiffs." *Id.* at 139 (citing *Scheidler*, 267 F. 3d at 697). Plaintiff previously relied on these cases. *See Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *12 ("Plaintiff urges this Court to look to opinions issued by the Second and Seventh Circuits," *Chevron Corp. v. Donziger*, 833 F.3d 74, 139 (2d Cir. 2016) and *Nat'l Org. for Women v. Scheidler*, 267 F.3d 687, 698 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003)). In *Sanofi-Aventis*, this Court noted Plaintiff was "unable to point to any cases within this Circuit or District that [have] adopted the views of the *Donzinger* or *Scheidler* courts" and eventually found "a private party may not seek equitable relief under RICO." 2020 WL

9

2394155, at *12. The Court came to this conclusion after highlighting "[t]he Third Circuit has not directly addressed whether RICO allows for a private right of equitable relief" but listing several courts within the Third Circuit that "have affirmatively held RICO does not establish a private right of equitable relief." *Id.* at *12 (citing *Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1137 (D.N.J. 1989); *Futterknecht v. Thurber*, Civ. A. No. 2:14-7395, 2015 WL 4603010, at *4 (D.N.J. July 30, 2015); *Johnson Dev. Grp., Inc. v. Carpenters Local Union No. 1578*, 728 F. Supp. 1142, 1146 (D.N.J. 1990)). The Court also relied on two other cases, not cited by either party, for support that recent courts in this District have not "explicitly held a private party may obtain equitable relief under RICO." *Id.* at *12 n.13 (citing *Adamo v. Jones*, Civ. A. No. 15-1073, 2016 WL 356031, at *12 (D.N.J. Jan. 29, 2016); *Kaul v. Christie*, Civ. A. No. 16-2364, 2019 WL 943656, at *28 n.40 (D.N.J. Feb. 24, 2019)).

Plaintiff does not address any of the cases this Court relied on in finding a private party may not seek equitable relief under RICO and did not move the Court to reconsider its March 31, 2020 Opinion in *Sanofi-Aventis*. (ECF No. 102 at 5–9.) Further, Plaintiff does not argue any "extraordinary circumstances" are present that justify a revisitation of the Court's prior decision in this case. *See Christianson*, 486 U.S. at 817. Instead, Plaintiff "requests that the Court permit [it] to pursue the remedy of injunctive relief under RICO," a request this Court has already considered and denied. (*Id.* at 9.) That is, Plaintiff is asking the Court to "review [a] legal issue[] previously decided." *Omnicare, Inc.*, 2020 WL 7022664, at *3. Therefore, Defendants' Motion to Dismiss the RICO claims is **GRANTED WITH PREJUDICE**.

    B.    **MFSAA**

Plaintiff brings Count Fifteen of the Second Amended Complaint, against all Defendants, pursuant to the Minnesota False Statements in Advertising Act ("MFSAA"), Minn. Stat. Ann.

10

§ 325F.67. (ECF No. 75, ¶¶ 434–41.) Defendants argue the Second Amended Complaint fails to allege "a single instance in which defendants directed 'promotional and marketing materials' to consumers." (ECF No. 93-1 at 8.) Specifically, Defendants note Plaintiff rehashes the argument that retail pharmacies rely on Defendants' published benchmark prices and contend Defendants' list prices "cause discount cards offered by third-parties to mislead consumers." (*Id.* 8–9.) Further, Defendants argue Plaintiff "fails to explain how *discount* programs could be misleading in any fashion." (*Id.* at 11.)

Plaintiff argues its new factual allegations demonstrate Defendants "placed before the public a series of deceptive list prices that directly raise the price some Minnesota pharmacies charge to vulnerable Minnesotans for their insulin" which indirectly causes "entities downstream in the drug supply chain to falsely advertise that they are providing discounts to consumers in need of assistance." (ECF No. 102 at 9–10.) These new factual allegations include the following:

- Plaintiff specifies the reporting services—Red Book, Gold Standard Drug Database, and Medi-Span Price Rx—upon which Defendants' further disseminated their benchmark prices. (ECF No. 75 ¶ 34.) And these services could not verify prices "that manufacturers receive after paying PBM rates, because rebate contracts are confidential." (*Id.*)

- Plaintiff alleges "at least one Minnesota pharmacy" develops the price of brand-name insulin by "expressly referring to and relying on" the AWP that Eli Lilly and Novo Nordisk publicize and publish in the Gold Standard Drug Database. (*Id.* ¶ 35.) This means "Minnesotans purchasing Defendants' brand-name insulin products from the pharmacy pay more money for life-sustaining medication based on the deceptive and inflated AWPs of Defendants' insulin products." (*Id.*)

11

- The reporting services that manufacturers use update price changes quickly, which is important "because retail pharmacies relying on Defendants' published benchmark prices must also change their prices when the benchmark price of a product increases, or else face losing money or market share to other pharmacies with similar pricing schemes." (*Id.* ¶ 75.)

- Regardless of whether "a pharmacy sets a cash price by directly referencing the benchmark price" or "sets a price based on what the wholesaler charged, both pricing deviations trace directly back to the manufacturer's benchmark price." (*Id.* ¶ 77.)

- Plaintiff alleges that due to Defendants' deceptive benchmark prices, "the price that these cash customers pay for analog insulin products has increased dramatically." (*Id.* ¶ 78.)

- "If Defendants published benchmark prices that were not deceptive and misleading and instead accurately reflected the true net price of insulin, they would charge less to their wholesalers, which could in turn charge less to pharmacies, which could in turn charge less to patients who" pay cash for insulin. (*Id.* ¶ 79.) Plaintiff alleges Defendants' fraudulent pricing practices cause several actors to charge more for insulin, "all of which is directly caused by Defendants setting and publishing deceptively and misleadingly inflated benchmark prices." (*Id.*)

- According to Plaintiff, Defendants' publication of inflated benchmark prices also "causes companies distributing drug discount cards to mislead consumers." (*Id.* ¶ 83.) PBMs like Express Scripts and Optum have "prescription drug card programs" that offer drugs at steep discounts. (*Id.*) However, these discounts "are

in reference to Defendants' deceptively inflated" AWP. (*Id.*) This provides "the benefit of advertising seemingly-steep discounts when such discounts do not actually reflect the price at which the drugs are actually sold." (*Id.*)

- Because Defendants' benchmark prices "are set without regard to actual cost paid by the overwhelming majority of buyers," two kinds of false advertising occur: "artificially-inflated discounts for some drugs, and artificially-inflated pricing for others." (*Id.* ¶ 87.)

Defendants argue this Court already held that publications of insulin list prices are not advertisements under the MFSAA and that the connection between the publication of list prices and consumer action is too attenuated to sustain a cause of action under the MFSAA. (ECF No. 93-1 at 8.)

Plaintiff contends Defendants' publicly disseminated list prices are advertisements under the MFSAA because they (1) call attention to Defendants' products by using false prices and (2) are intended to influence the sale of their insulin products. (*Id.* at 11.) Additionally, Plaintiff notes Defendants' argument that an advertisement is a statement that must be directed to a consumer is unsupported by caselaw, and this Court has already found misleading statements need not be directed to consumers under the MFSAA. (*Id.* at 12.)

Anyone who "makes, publishes, disseminates, circulates, or places before the public, or causes, *directly or indirectly*, to be made, published, disseminated, circulated, or placed before the public . . . an advertisement of any sort regarding merchandise" which "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading" has violated the MFSAA. Minn. Stat. Ann. § 325F.67. The statute "is a criminal statute which prohibits the public dissemination of misleading advertising with the intent to sell something to the public

13

even if no one suffers pecuniary damage." *Kronebusch v. MVBA Harvestore Sys.*, 488 N.W.2d 490, 494 (Minn. Ct. App. 1992). No Minnesota court has directly addressed the issue of whether list prices published by manufacturers constitute advertisements under the MFSAA, but at least one other district court has decided a similar issue. *See Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 84 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009) (noting that by publishing list prices, "manufacturers are not advertising prices to the consuming public, but to doctors and pharmacies, and the manufacturers are not involved in the offering of discounts off of those prices to consumers."). This Court also previously addressed this issue in deciding Plaintiff's First Amended Complaint. *Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *19 (after noting that the MFSAA should be construed broadly, finding that "under the facts presented . . . the connection between the publication of list prices and consumer action to be too attenuated to sustain a cause of action pursuant to the MFSAA").

Plaintiff again relies on *UnitedHealth Grp. Inc. v. State ex rel. Swanson*, No. 06-2013, 2007 WL 4234545, at *4 (Minn. Ct. App. Dec. 4, 2007), just as it did in *Sanofi-Aventis*, 2020 WL 2394155, at * 19. This Court noted the *Swanson* court "found that federal securities filings were advertisements under the MFSAA." *Id.* However, this Court clarified "the *Swanson* court qualified its holding by stating 'to the extent the public relies on appellant's financial statements, press releases, and periodic filings to decide whether to buy or sell appellant's stock, we conclude these documents are advertisements under the MFSAA.'" *Id.* (quoting *Swanson*, WL 4234545, at *4).

Plaintiff highlights each of Defendants' arguments and provides reasons why such arguments are "unpersuasive." (ECF No. 102 at 11.) First, Plaintiff points out that Defendants inaccurately argue the Court "held that mere publications of insulin prices are not 'advertisements' under the MFSAA." (*Id.* at 11 (citing ECF No. 93-1 at 8).) This Court's holding was more limited

14

than Defendants indicate. *Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *19. To the extent Plaintiff argues this Court previously limited its holding to the facts before it and because Plaintiff has provided new factual allegations, the Court agrees.

Second, Plaintiff argues Defendants' contention that the MFSAA requires an advertisement to be a statement directed to a consumer is without support under the MFSAA and notes the Court has already found the MFSAA does not require such direction. (ECF No. 102 at 12.) The court in *Kronebusch*, when reviewing a jury verdict awarding attorney fees pursuant to Minn. Stat. §§ 325F.67 and 8.31, had to decide whether "the phrase 'to the public' includes both consumers and non-consumers." 488 N.W.2d 490, 494 (Minn. Ct. App. 1992). The statute was silent on this question, so the Court had to review the legislative history of the statute and its application in the Minnesota court system. *Id.* The court reviewed the Minnesota legislature's amendments to § 325F.67 and found interpreting "to the public" to include "both consumers and non-consumers [gave] full effect" to the legislature's intent. *Id.* Further, the court found this interpretation consistent with prior case law, as "Minnesota courts have focused on the defendant's actions rather than the complaining party's consumer or non-consumer status." *Id.* In sum, the court found the phrase "to the public" included both consumers and non-consumers. *See id.* at 496. This Court, after reviewing other Minnesota cases interpreting the MFSAA in in *Sanofi-Aventis*, found that Defendants failed to meet their burden to show Minnesota's consumer protection statutes "require that action be specifically directed at consumers to be actionable." *Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *15. Therefore, the Court also agrees with Plaintiff that the MFSAA does not require advertisements to be "directed" to a consumer.

While Plaintiff has provided more factual allegations that detail the connection between the publication of list prices and consumer action, that connection is still too attenuated to sustain

15

a cause of action under the MFSAA. Plaintiff's main contention is still that Defendants' publication of list prices leads to consumer harm, through either higher prices or "impressive-sounding" discounts. (ECF No. 102 at 3.) However, these higher prices or discounts do not come from Defendants—they come from downstream third parties. (*See id.* at 10.) While the Court must broadly construe the MFSAA, *State v. Phillip Morris, Inc.*, 551 N.W.2d 490, 495–96 (Minn. 1996), Plaintiff does not provide the Court with any cases that authorize such an expansive reading of the MFSAA. As noted above, the few cases that have dealt with pharmaceutical list prices in the context of false advertising have not found that a manufacturer's publication of list prices constitutes an advertisement. The Court will not expand the reach of the MFSAA with such little guidance, especially with no direction from Minnesota courts on this specific issue.

Even assuming the publication of list prices did qualify as an advertisement under the MFSAA, Plaintiff has not demonstrated that those list prices or WACs are false or deceptive in any way, as the statute requires. *See* Minn. Stat. Ann. §§ 325F.67. Interestingly, the Minnesota legislature itself has supported the idea that the WAC is the correct or true value of the drug when manufacturers determine their drugs' prices. Minn. Stat. Ann. § 151.74 subdiv. 13(a)(3) requires each insulin manufacturer to "report to the Board of Pharmacy . . . the value of the insulin provided by the manufacturer" to Minnesota residents receiving insulin on an urgent-need basis or those residents "participating in the manufacturer's patient assistance program." *Id.* The "value" of insulin "means the *wholesale acquisition cost* of the insulin provided" to Minnesota residents. *Id.* (emphasis added). According to the Minnesota legislature, the WAC or list prices that Defendants allegedly publish reflect the true value of the insulin it sells to its consumers. *See id.* As Defendants point out, this statute contradicts Plaintiff's claim that Defendants' benchmark prices are deceptive or false statements because they do not reflect the true value of insulin. And while Defendants'

provided this argument in a footnote in the brief accompanying their Motion, Plaintiff did not address it at all in its opposition. (*See* ECF No. 102 at 9–15.)

With the Minnesota legislature affirmatively stating the WAC is the value of insulin, the WAC price cannot be false or deceptive under Minn. Stat. Ann. § 325F.67. Therefore, Plaintiffs cannot state a claim upon which relief can be granted. Accordingly, Defendants' Motion to Dismiss Count XV is **GRANTED WITH PREJUDICE.**

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the RICO Claims and Count XV (False Advertising) is **GRANTED WITH PREJUDICE**.[2] An accompanying Order will follow.

**Date: March 12, 2021**　　　　　　　　　　　　　　　　*s/ Brian R. Martinotti*
　　　　　　　　　　　　　　　　　　　　　　　　　　　**HON. BRIAN R. MARTINOTTI**
　　　　　　　　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**

---

[2] "[D]ismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits." *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002). The Court previously dismissed Plaintiff's RICO claims and false advertising claim without prejudice. (*See* ECF No. 74 at 44–45.) The Court finds dismissal with prejudice is proper here because it is unlikely Plaintiff can further amend its complaint to cure the deficiencies under either set of claims. *Credico v. CEO Idaho Nat. Lab'y*, 461 F. App'x 78, 79 (3d Cir. 2012) (affirming District Court's dismissal of plaintiff's complaint "without . . . leave to amend as any amendment would have been futile"); *Redmond v. Fresh Grocers Store*, 402 F. App'x 685, 686 (3d Cir. 2010) (same) *IpVenture Inc. v. Lenovo Grp. Ltd.*, Civ. A. No. 11-588, 2013 WL 126276, at *3 (D. Del. Jan. 8, 2013) (choosing to dismiss claims with prejudice after dismissing the same allegations without prejudice in an earlier action because it was "clear that Plaintiff cannot satisfactorily amend its Complaint").