# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STATE OF MINNESOTA, BY ITS ATTORNEY GENERAL, KEITH ELLISON,<br><br>*Plaintiff*,<br><br>v.<br><br>SANOFI-AVENTIS U.S. LLC, NOVO NORDISK, INC., AND ELI LILLY AND CO.,<br><br>*Defendants*. | Civil Action No.: 18-cv-14999-BRM-RLS<br><br>**SETTLEMENT AGREEMENT, RELEASE, AND ORDER** |

WHEREAS, Plaintiff, State of Minnesota, by its Attorney General Keith Ellison (the "State" or "Attorney General") filed a Complaint on October 16, 2018, in the United States District Court for the District of New Jersey, Civil Action 18-cv-14999, and filed a Second Amended Complaint on April 21, 2020 (the "Action") against Eli Lilly and Company ("Lilly"), among other defendants, asserting claims relating to Lilly's insulin products;

WHEREAS, Lilly's March 25, 2021 Answer and Affirmative Defenses to the Second Amended Complaint denied the State's allegations;

WHEREAS, the State and Lilly desire to resolve the Action by this Settlement Agreement, Release, and Order (the "Agreement") containing the relief agreed to by the State and Lilly, whether acting through its respective directors, officers, employees, representatives, agents, affiliates, and/or subsidiaries (the "Parties"); and

NOW, THEREFORE, the Parties agree to the following terms and conditions:

## DEFINITIONS

1.    For the purposes of this Agreement, the definitions in paragraphs 2 through 12

1

apply.

2. "Affordability Solutions" means Lilly's Insulin Value Program, which allows anyone who is a U.S. resident, over 18 years of age, and not enrolled in a government health insurance program to purchase their monthly prescription of a Lilly Insulin Product for no more than $35 out of pocket, as well as any equivalent Lilly affordability initiative that allows consumers to purchase their monthly prescription of a Lilly Insulin Product for no more than $35 out of pocket.

3. "Affordability Solutions Website" means the web page or set of web pages maintained by Lilly to disseminate information about its Affordability Solutions.

4. "BIN" refers to the Bank Identification Number typically associated with a health insurance provider that is used in routing and processing pharmacy claims, including but not limited to any regular "cash" BIN a pharmacy may utilize for uninsured customers.

5. "Biosimilar" means a biological product that the U.S. Food & Drug Administration (FDA) has approved as biosimilar to or interchangeable with a reference insulin product pursuant to a biologics license application submitted under section 351(k) of the Public Health Service Act.

6. "Cash-Paying Customer" refers to any Minnesota resident filling a prescription for a Lilly Insulin Product at a pharmacy located in Minnesota where the prescription is not processed through any applicable Health Coverage, regardless of whether or not the Minnesota resident has Health Coverage, except a "Cash-Paying Customer" does not include Minnesota residents who receive Health Coverage through a government health insurance program.

7. "Covered Conduct" means any conduct, practices, acts, statements, disclosures, representations, or omissions occurring up to and including the Effective Date of this Agreement made by the Lilly Released Parties in connection with sale of, purchase of, pricing of, rebates paid

for, or contracting related to the Lilly Insulin Products.

8. "Effective Date" means the date upon which this Agreement has been fully executed by all of the signatories below.

9. "Health Coverage" means any form of coverage provided by a commercial health insurer, health maintenance organization, employer-sponsored health plan, or other health coverage provided by commercial or private payers or by any state or federal governmental program.

10. "Lilly Insulin Product" means those Lilly insulin products that Lilly markets in Kwikpen, cartridge, or vial presentations in the United States under the brands Humalog, Humulin, Insulin Lispro, Basaglar, Lyumjev, and Rezvoglar, and any Biosimilar that Lilly markets in Kwikpen, cartridge, or vial presentations in the United States during the term of this Agreement. For the avoidance of doubt, nothing in this Agreement obligates Lilly to continue to sell or market any particular product.

11. "Lilly Released Parties" means Eli Lilly and Company, and its affiliates, divisions, parents, subsidiaries, assigns, and successors, and each of the foregoing's past and present officers, directors, employees, representatives, and agents.

12. "Third Party Messaging Company" means a company that provides messaging services to pharmacies in its network, such as Change Healthcare's eRx or RelayHealth.

## NO ADMISSION OF LIABILITY

13. Lilly has denied, and continues to deny, any wrongdoing, violation, or legal liability arising from any of the facts or conduct alleged in this Action. Neither this Agreement nor any settlement-related document is an admission of any wrongdoing, violation, or legal liability for any purpose.

**TERMS**

14. Lilly shall make available to Cash-Paying Customers, who present at the pharmacy with a valid prescription for a Lilly Insulin Product that is currently marketed in the United States, the option to pay no more than $35 out of pocket—or no more than the lowest applicable statutory cap under federal or Minnesota law for all commercially insured insulin users, whichever is lower—for the Cash-Paying Customer's monthly prescription of that Lilly Insulin Product. For the avoidance of doubt, to the extent that any federal or Minnesota law would reduce a Minnesota resident's out-of-pocket costs for a Lilly Insulin Product to less than $35 for a monthly prescription of that Lilly Insulin Product, this Agreement does not prevent that Minnesota resident from obtaining a Lilly Insulin Product at that lower out-of-pocket cost pursuant to that law, as applicable.

15. Lilly shall continue to make the option in Paragraph 14 available to Cash-Paying Customers in a format that is no more complex than the format utilized on https://www.insulinaffordability.com as of September 1, 2023.

16. Lilly's Affordability Solutions Website shall have a feature that allows Cash-Paying Customers to receive electronically any coupon, co-payment card, or other documentation that they must present to a pharmacy for purposes of utilizing an Affordability Solution. Lilly shall maintain a version of its Affordability Solutions Website that is equivalent to the English-language version in Spanish. Lilly shall cooperate with the Attorney General to assist the Attorney General to provide Hmong and Somali translations of Lilly's eligibility questionnaire and instructions on how to use Lilly Affordability Solutions.

17. So long as Insulin Lispro and Rezvoglar are otherwise commercially available during the term of the Agreement, Lilly will agree to make Insulin Lispro and Rezvoglar available

to wholesalers, and the Minnesota Department of Corrections may contract with wholesalers through its agents to purchase such products to dispense to inmates at its correctional facilities.

18. Separate from Lilly's pre-existing and ongoing charitable donations to the national relief agencies Americares, Direct Relief, and Dispensary of Hope (the "National Relief Agencies"), Lilly commits to working with the National Relief Agencies to identify additional non-profit clinics, or additional locations of non-profit clinics, in Minnesota (the "Clinics") that are eligible and willing to accept Lilly Insulin Products from National Relief Agencies. Lilly agrees to offer to provide free Lilly Insulin Products to these National Relief Agencies (subject to limitations set forth in this Agreement and consistent with Lilly's agreement with the National Relief Agency) such that the National Relief Agencies can provide Lilly Insulin Products to any additional approved, eligible non-profit Clinics in Minnesota, so that those additional Clinics may provide these free Lilly Insulin Products to individuals with a prescription for Lilly Insulin Products. Lilly's obligations in Paragraphs 18-25 of this Agreement shall apply to a maximum of 15 non-profit Clinics in Minnesota total at any given time during the term of the Agreement.

19. To identify new non-profit Clinics, Lilly will defer to eligibility and approval determinations made by each National Relief Agency as it does in the normal course of business for Lilly's existing relationships with these National Relief Agencies. Such Clinics must apply to the National Relief Agency to become approved to receive free Lilly Insulin Products, and submit orders for Lilly Insulin Products through the processes determined by those National Relief Agencies. With respect to the Attorney General's efforts to identify and secure approval of eligible non-profit Clinics in Minnesota to receive free Lilly Insulin Products from a National Relief Agency, Lilly agrees to provide reasonable cooperation in response to Attorney General's requests consistent with the other terms of this Agreement.

20. If a National Relief Agency identifies a non-profit Clinic in Minnesota as eligible and willing to receive Lilly Insulin Products from a National Relief Agency, including if the Attorney General identifies any non-profit Clinics that would like to receive and dispense Lilly Insulin Products and that non-profit Clinic is eligible and approved to receive Lilly Insulin Products from a National Relief Agency, Lilly commits to providing the amount of free Lilly Insulin Products to the National Relief Agency that the eligible non-profit Clinic requests from the National Relief Agency (to the extent the request is approved by the National Relief Agency). The Attorney General and Lilly agree that, while Lilly commits to offering free Lilly Insulin Products to National Relief Agencies for additional Clinics in Minnesota, Lilly cannot compel any National Relief Agency or Clinic to accept or dispense the Lilly Insulin Products.

21. In connection with the obligations in Paragraphs 18-20, Lilly will undertake efforts in cooperation with National Relief Agencies to identify high-need geographical locations throughout Minnesota where prescriptions of Lilly Insulin Products are repeatedly filled by Cash-Paying Customers and identify eligible non-profit Clinics as detailed in Paragraphs 21-25 of this Agreement, including, where possible, eligible non-profit Clinics in such high-need geographical locations.

22. Within 30 days of the Effective Date, Lilly shall work with each National Relief Agency to request that each National Relief Agency provide a list of all non-profit Clinics in Minnesota in the National Relief Agency's network that are eligible and approved to receive Lilly Insulin Products (the "Eligible Clinic List"). Within 30 days after receipt of the Eligible Clinic List from each National Relief Agency, Lilly shall work with each National Relief Agency to request that each National Relief Agency contact each eligible and approved non-profit Clinic to inquire if that Clinic is willing to receive Lilly Insulin Products from the National Relief Agency,

then report back to Lilly with the results of that outreach as appropriate. Lilly shall reasonably cooperate with the Attorney General to provide relevant information learned through the efforts to identify high-need geographical locations and Clinics described in Paragraphs 21-25. Any information that Lilly provides to the Attorney General in connection with any of the efforts to identify Clinics shall be protected from disclosure under Minn. Stat. §§ 13.37 and 13.39.

23.   Beginning in Lilly's first full fiscal quarter after the Effective Date and continuing for a period of five years thereafter on a biannual basis, Lilly commits to take the following actions in an effort to increase the number of non-profit Clinics in Minnesota that receive free Lilly Insulin Products:

  a. Lilly shall work with each National Relief Agency to identify high-need geographical locations throughout Minnesota where prescriptions of Lilly Insulin Products are repeatedly filled by Cash-Paying Customers.

  b. Lilly shall work with each National Relief Agency to request that each National Relief Agency provide Lilly with a list of all non-profit Clinics in Minnesota in the National Relief Agency's network that are eligible and approved to receive Lilly Insulin Products from the National Relief Agency (the "Biannual Eligible Clinic List").

  c. Lilly shall work with each National Relief Agency to request that the National Relief Agency raise awareness of the National Relief Agency's eligibility requirements and the approval process for non-profit clinics in Minnesota, including non-profit Clinics in high-need geographical locations, to join the National Relief Agency's network.

  d. For all subsequent Biannual Eligible Clinic Lists that each National Relief Agency provides, Lilly shall work with each National Relief Agency to request that the list includes a list of all new non-profit Clinics in Minnesota in the National Relief

Agency's network that were not present in either of the prior two quarters.

 e. Lilly shall work with each National Relief Agency to request that each National Relief Agency inquire with all eligible Minnesota non-profit Clinics in their network about whether they would like to receive Lilly Insulin Products from the National Relief Agency. Lilly shall work with each National Relief Agency to request that each National Relief Agency make these inquiries with eligible Clinics, even if those same Clinics have declined to receive Lilly Insulin Products from the National Relief Agency in prior biannual periods.

24. If a new non-profit Clinic is deemed eligible and approved to receive Lilly Insulin Products by a National Relief Agency and agrees through the partnering National Relief Agency to receive such Lilly Insulin Products from the National Relief Agency, then Lilly will make the new non-profit Clinic's requested amount of free Lilly Insulin Product available to the National Relief Agency in the normal course of business (and to the extent the request is approved by the National Relief Agency).

25. To the extent a National Relief Agency declines to accept an otherwise eligible non-profit Clinic that applies to receive free Lilly Insulin Products, Lilly agrees to work in good faith with the National Relief Agency to understand its decision and attempt, in good faith, to overcome the impediment to approval, if possible.

26. Lilly shall enter into contract(s) with one or more Third Party Messaging Companies to implement the following program, designed to assist Cash-Paying Customers whose prescription is processed to a pharmacy's regular cash BIN to quickly obtain Lilly Insulin Products at affordable prices at the point of sale, within 60 days of the Effective Date:

 a. If a pharmacist at a pharmacy that allows the messaging described herein processes a

Cash-Paying Customer's prescription for a Lilly Insulin Product to its regular cash BIN, the Third-Party Messaging Companies with which Lilly has contracted will provide the pharmacy with a message (the precise language of which Lilly will approve) advising the pharmacy that it can facilitate the Cash-Paying Customer's use of one of Lilly's Affordability Solutions by utilizing (or directing the Cash-Paying Customer to utilize) a specified link to Lilly's Affordability Solutions Website or a specified toll free number.  If feasible, such messaging shall indicate that the consumer may be eligible for substantially discounted Lilly Insulin Products.

b. Upon receiving a Cash-Paying Customer's request to use one of its insulin Affordability Solutions at a pharmacy that allows the messaging described herein, Lilly shall determine the Cash-Paying Customer's eligibility according to the terms set forth on its Affordability Solutions Website.  Lilly shall make eligibility determinations based on information received from the Cash-Paying Customer or pharmacy as promptly as possible (generally, within a matter of minutes), so as to enable the Cash-Paying Customer's access to discounted Lilly Insulin Products in accordance with the terms of the relevant Affordability Solution.  Upon a determination of eligibility, Lilly shall immediately take steps to supply the pharmacist or eligible Cash-Paying Customer with an appropriate coupon, voucher, or other notification that includes a BIN that the pharmacy will submit for adjudication of the prescription.

c. To the extent necessary to enable pharmacists to assist Cash-Paying Customers' use of Lilly's Affordability Solutions in connection with the messaging described herein, Lilly shall make reasonable modifications to its existing processes (for example, any additional training of call center employees).

    d. To the extent necessary to execute this program, Lilly shall make reasonable modifications to its Affordability Solutions Website and educate its call center employees to enable prompt pharmacist-assisted eligibility determinations for its Affordability Solutions, and to comply with the foregoing provisions.

27. Beginning in Lilly's first full fiscal quarter after implementation of the messaging program and continuing for a period of three years thereafter, Lilly shall submit to the Attorney General, no later than 45 days after the conclusion of the fiscal quarter, a quarterly report describing for the prior quarter, with respect to Minnesota pharmacies:

    a. Number of pharmacies that are participating in the messaging program described above in Paragraph 26 ("the Messaging Program");

    b. Number of times a message was sent via a Third-Party Messaging Company as a result of the Messaging Program in response to a pharmacist entering a cash BIN;

    c. Number of customers at Minnesota pharmacies who used a $35 co-pay card obtained from Lilly and who self-identify to Lilly as paying for Insulin Products in cash;

    d. Number of customers described in Paragraph 27(c) who enrolled after a message sent with the Messaging Program, to the extent the Third-Party Messaging Companies can track this information;

    e. Total value of discounts provided to customers described in Paragraph 27(c) who enrolled after a message sent with the Messaging Program, to the extent the Third-Party Messaging Companies can track this information.

28. Lilly shall maintain for at least three years all underlying documentation and data supporting the reports described in Paragraph 27, and shall furnish this documentation and data to the Attorney General upon request within 14 days of such request.

29. Lilly shall report any material changes to the terms and conditions of its Affordability Solutions which are applicable to Cash-Paying Customers within 30 days of the implementation of those changes.

30. In any case where the circumstances warrant, the Attorney General may require Lilly to submit an interim report upon 30 days' notice containing the items specified in Paragraph 27 of this Agreement.

## RELEASE

31. Upon the execution of this Agreement, the Lilly Released Parties are hereby released and forever discharged from any and all claims, causes of action, or requests for relief of any kind arising from, connected with, or related to the Covered Conduct that the State and any of its departments, agencies, divisions, boards, or commissions, including the Attorney General, now has or may hereafter have against the Lilly Released Parties, including claims for damages, restitution, disgorgement, injunctive or other equitable relief, fines, costs, expenses, fees (including attorney's fees), and penalties pursuant to 18 U.S.C. § 1962, Minnesota or federal antitrust laws, the Minnesota or federal False Claims Act, Minnesota Statutes §§ 325D.43-48, 325F.67, and 325F.68-.694, or under other state or federal statutory, regulatory, or common law theories, in law or in equity, such as unfair, deceptive, or fraudulent trade practices, fraud, negligence, strict liability, warranty or breach thereof, willful or reckless misconduct, or unjust enrichment, including any and all claims and allegations that were or could have been asserted in the Action.

32. The State, through this Agreement, reserves, and does not settle, release, or resolve any of the following claims, rights, and remedies against the Lilly Released Parties:

- Any claims arising under state tax laws;
- Any claims for the violation of securities laws;
- Any criminal liability;

- Any civil or regulatory claims unrelated to the Covered Conduct;

- Any civil or regulatory claims involving conduct required or prohibited by Minnesota Statutes Chapter 151, including Minnesota Statutes section 151.74; provided, however, that such reservation does not include claims under Minn. Stat. § 151.061 or disciplinary action under Minn. Stat. § 151.071 subds. 2(6), 2(9), 2(17), or 2(21) related to the Covered Conduct;

- Any civil or regulatory claims involving the reporting required by Minnesota Statutes section 62J.84;

- Any claims for breach of contract that the administrator of MMCAP Infuse or a member of MMCAP Infuse could assert regarding the agreements MMS2000316, MMS2000317, and MMS2000320 between the Minnesota Department of Administration and the Lilly Released Parties; provided, however, that such reservation does not include claims related to the allegations in the Second Amended Complaint;

- Any claims involving Medicaid drug rebates; provided, however, that such reservation does not include claims related to the allegations in the Second Amended Complaint;

- Any claims of any other person or entity involving any private causes of action, claims, and remedies brought by a private party, including, but not limited to, private causes of action, claims, or remedies provided for under Minn. Stat. § 8.31 subd. 3a; and

- Any action to enforce this Agreement and subsequent, related orders or judgments.

The Lilly Released Parties reserve, and this Agreement does not settle, release, or resolve, and is without prejudice to, all defenses with respect to the above claims, rights, and remedies listed in this Paragraph.

33. Nothing in this Agreement waives any defenses that may be raised in response to

any claims, causes of action, or requests for relief of any kind brought by or on behalf of any Lilly Released Party.  For the avoidance of doubt, nothing in this paragraph is intended to narrow or alter the scope of the release in Paragraph 31, which includes, among other things, a release from claims, counterclaims, and third-party claims arising from, connected with, or related to the Covered Conduct that could be brought by the State against the Lilly Released Parties.

34. The release in Paragraph 31 of this Agreement does not in any way release claims against any of the defendants in the Action aside from Lilly.

35. In consideration of the covenants set forth herein, within ten (10) days of the Effective Date, the Attorney General shall file a Dismissal with Prejudice, pursuant to which the Attorney General shall dismiss with prejudice all of its respective claims against Lilly in the Action, with each party to bear its own costs, expenses, and attorneys' fees.

## DISPUTE RESOLUTION

36. The Parties agree that United States District Court for the District of New Jersey shall retain jurisdiction over all disputes regarding this Agreement.  The Parties consent to jurisdiction by this Court to hear any Motion seeking to enforce, modify, or interpret this Agreement.  Any such Motion shall be filed in accordance with Local Civil Rule 7.1 of the Local Civil and Criminal Rules of the United States District Court for the District of New Jersey.

37. To the extent that the Attorney General has good cause to believe that Lilly has not complied with any provision of this Agreement, the Attorney General shall notify Lilly in writing of the specific objection, identify with particularity the provisions of this Agreement that have allegedly not been complied with, and give Lilly 30 business days to respond to the notification.

38. Upon receipt of written notice from the Attorney General, Lilly shall provide a good-faith written response to the Attorney General containing either a statement explaining why

Lilly believes it is in compliance with the Agreement or a detailed explanation of how the alleged violation occurred and a statement explaining how and when Lilly intends to remedy the alleged violation. The Attorney General may not take any action during the 30-day response period. Nothing shall prevent the Attorney General from agreeing in writing to provide Lilly with additional time to respond to the notice.

39. The provisions of this Agreement shall be construed in accordance with the laws of the State of Minnesota.

## GENERAL TERMS

40. Unless otherwise specified within this Agreement, Lilly's obligations under this Agreement shall continue for a period of five years after the Effective Date. Nothing in this Agreement shall relieve Lilly of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

41. The Parties acknowledge that certain performance obligations involving third parties may be outside of the Parties' control, including the actions of non-profit clinics, national relief agencies, Third Party Messaging Companies, wholesalers, pharmacies, individual pharmacists, consumers, and other actors in the drug supply chain. In the event that Lilly believes that any third party is interfering with the purpose of the Agreement or obstructing, impairing, or delaying Lilly's ability to comply with its obligations under this Agreement, the Parties agree to confer in good faith about steps that either or both may be able to take to encourage cooperation by third parties.

42. To seek a modification of this Agreement, Lilly shall make a written request for such modification to the Attorney General. The Attorney General will respond to any such request within 60 days, and that response may be a request for additional information. Lilly will not unreasonably withhold additional information, and the Attorney General will not unreasonably

withhold consent to modify this Agreement in light of federal or state legislative or regulatory action, or any other conditions that would make performance impractical or impossible. This Agreement may not be amended except by an instrument in writing signed on behalf of the Parties to this Agreement.

43. In the event that any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement.

44. The Agreement and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

45. Any failure by any Party to this Agreement to insist upon the strict performance by another Party of any provision of this Agreement shall not be deemed a waiver of such provision.

46. Each person signing this Agreement represents that such person has the authority to bind their respective Party to this Agreement.

47. This Agreement is not intended for use by any third party in any other proceeding.

48. This Agreement may be executed in multiple counterparts by the Parties hereto. All counterparts so executed shall constitute one agreement binding upon all Parties, notwithstanding that all Parties are not signatories to the original or the same counterpart. Each counterpart shall be deemed an original to this Agreement, all of which shall constitute one agreement to be valid as of the Effective Date. For purposes of this Agreement, copies of signatures shall be treated the same as originals. Documents executed, scanned, and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such scanned and electronic signatures having the

same legal effect as original signatures.

49. The failure of a party to exercise any rights under this Agreement shall not be deemed to be a waiver of any right or any future rights.

50. Nothing in this Agreement shall be construed to limit the power or authority of the State of Minnesota or the Attorney General except as expressly set forth herein.

51. This Agreement constitutes the full and complete terms of the agreement entered into by the Parties hereto.  The Parties agree that (1) this Agreement, prior versions of this Agreement, and any communications or documents relating to this Agreement, are protected from disclosure under Minn. R. Evid. 408 and Federal Rule of Evidence 408; and (2) this Agreement, prior versions of this Agreement, and any communications or documents relating to this Agreement, may not be introduced in any action for any purpose whatsoever, other than for purposes of enforcing this Agreement.

52. Notices or communications required by or related to this Agreement must be sent via certified mail or emailed to the following persons, or any person subsequently designated by the parties to this Agreement to receive such notices:

If to Lilly, to:

Daniel Siegfried
Associate Vice President, Assistant General Counsel
Eli Lilly and Company
Lilly Corporate Center
Indianapolis, IN 46285
siegfried_daniel@lilly.com,

or in his absence, to the person holding the title of Assistant General Counsel - Litigation.

If to the Attorney General, to:

Noah Lewellen
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
noah.lewellen@ag.state.mn.us

If mail or email is returned or indicated as undeliverable, notice on the Attorney General shall be made to the Manager or Deputy of the AGO's Consumer, Wage, and Antitrust Division, or any successor division that is responsible for civil enforcement of consumer-protection laws.

53. On or before executing this Agreement, Lilly shall provide the Attorney General with Lilly's taxpayer identification number (TIN) or social security number. Lilly shall cooperate in the Attorney General's completion of IRS Form 1098-F by providing the Attorney General with any additional information requested by the Attorney General regarding that form.

Dated:                                          KEITH ELLISON
                                                Attorney General
                                                State of Minnesota

                                                JAMES W. CANADAY
                                                Deputy Attorney General

                                                JESSICA WHITNEY
                                                Deputy Attorney General


                                                By: *Noah Lewellen*
                                                NOAH LEWELLEN
                                                Assistant Attorney General

                                                JASON PLEGGENKUHLE
                                                Assistant Attorney General

                                                ALEX BALDWIN
                                                Assistant Attorney General

                                                JUSTIN MOOR
                                                Assistant Attorney General

Dated:  February 5, 2024

_____
Daniel Siegfried
Associate Vice President, Assistant General Counsel
Eli Lilly and Company

**ORDER**

Based upon the foregoing Agreement, it is SO ORDERED.

Date: _____  _____
THE HONORABLE
BRIAN R. MARTINOTTI
UNITED STATES DISTRICT JUDGE